## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DAVID R. HOSE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:07-cv-01805 PLF** |
| | ) | **ECF** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### UNITED STATES' MOTION TO DISMISS

The United States hereby moves to dismiss Plaintiff's Complaint for lack of subject

matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The United States

respectfully submits the attached Memorandum of Points and Authorities, a proposed order, and

exhibits in support of this motion.

Dated: March 3, 2008 _____        Respectfully Submitted,


                                _____/s/_____


JEFFREY BUCHOLTZ                    KIRSTEN L. WILKERSON (MO Bar #49082)
Acting Assistant Attorney General   Trial Attorney
Civil Division                      Torts Branch (Environmental Torts)
                                    United States Department of Justice
C. FREDERICK BECKNER, III           1331 Pennsylvania Ave., NW
Deputy Assistant Attorney General   Suite 8014 South
Civil Division                      Tel: (202) 353-7750/Fax: (202) 616-4473
                                    Kirsten.wilkerson@usdoj.gov
J. PATRICK GLYNN
   D.C. Bar #219162                  CHRISTINA M. FALK
Director Environmental Torts        Senior Trial Counsel

DAVID S. FISHBACK                    JASON S. PATIL
   D.C. Bar #182907                  Trial Counsel
Assistant Director Environmental Torts

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DAVID R. HOSE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:07-cv-01805 PLF** |
| ) | **ECF** |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION TO DISMISS

## TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

APPLICABLE LEGAL STANDARDS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.      Federal Rule of Civil Procedure 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.     Federal Tort Claims Act's Waiver of Sovereign Immunity . . . . . . . . . . . . . . 4

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.      The Virginia Workers' Compensation Act Bars Plaintiff's Suit . . . . . . . . . . . 6

    II.     The Dual Capacity Doctrine Is Not Recognized In Virginia  . . . . . . . . . . . . . 16

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

## TABLE OF AUTHORITIES

**PAGE**

### FEDERAL CASES

*Best v. United States,*
    522 F. Supp. 2d 252 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*\*Best v. Washington Metrop. Area Transit Auth.,*
    822 F.2d 1198 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Brady Campaign to Prevent Gun Violence v. Ashcroft,*
    339 F. Supp. 2d 68 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Coalition for Underground Expansion v. Mineta,*
    333 F.3d 193 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*\*Coulter v. United States,*
    256 F. Supp. 2d 484 (E.D. Va. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 15

*Dalehite v. United States,*
    346 U.S. 15 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Evans v. B.F. Perkins Co., a Div. Of Standex Intern Corp.,*
    166 F.3d 642 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Flores ex rel. J.F. v. Dist. of Columbia,*
    437 F. Supp. 2d 22 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Fowler v. Dist. Of Columbia,*
    122 F. Supp. 2d 37 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Herbert v. Nat'l Acad. of Sciences,*
    974 F.2d 192 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Horne v. General Electric Co.,*
    716 F.2d 253 (4th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*\*Hyman v. United States,*
    796 F. Supp. 905 (E.D. Va. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

ii

**PAGE**

*Jerome Stevens Pharms., Inc. v. FDA*,
 402 F.3d 1249 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*\*Kast v. PPG Industries, Inc.*,
 664 F. Supp. 237 (W.D. Va. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
 511 U.S. 375 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kugel v. United States*,
 947 F.2d 1504 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Laird v. Nelms*,
 406 U.S. 797 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Makarova v. United States*,
 201 F.3d 110 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Marshall v. Reno*,
 915 F. Supp. 426 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*McNutt v. Gen. Motors Acceptance Corp.*,
 298 U.S. 178 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*\*Muldrow v. United States*,
 972 F.2d 341 (4th Cir. 1992) (per curiam)
 1992 WL 200866 (4th Cir. August 14, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 15

*Nelson v. United States Postal Service*,
 189 F. Supp. 2d 450 (W.D. Va. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pendley v. United States*,
 856 F.2d 699 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9

*Perry v. U.S.*,
 882 F. Supp. 537 (E.D. Va. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9

*Quillen v. Int'l Playtex, Inc.*,
 789 F.2d 1041 (4th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**PAGE**

*Richards v. United States,*
    369 U.S. 1 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Scalia v. United States,*
    475 F. Supp. 1040 (S.D.N.Y. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Smith v. United States,*
    507 U.S. 197 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Spring v. United States,*
    833 F. Supp. 575 (E.D. Va. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Stuart v. Colorado Interstate Gas Co.,*
    271 F.3d 1221 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Telenor Satellite Services, Inc. v. United States,*
    71 Fed.Cl. 114 (Fed.Cl. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Sherwood,*
    312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Wilder v. United States,*
    873 F.2d 285 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Williams v. Gen. Services Admin.,*
    582 F. Supp. 442 (E.D. Pa. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATE CASES

*Erie Ins. Exchange v. Heffernan,*
    399 Md. 598 (Md. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*\*Henderson v. Central Telephone Co. of Va.,*
    233 Va. 377 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 15

*Jones v. Commonwealth,*
    267 Va. 218 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

**PAGE**

*Roberts v. City of Alexandria,*
    246 Va. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Shell Oil Co. v. Leftwich,*
    212 Va. 715 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**FEDERAL STATUTES**

10 U.S.C. § 5013(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22 U.S.C. § 2651(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

22 U.S.C. § 2656 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

22 U.S.C. § 3921 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

22 U.S.C. § 3926 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

28 U.S.C. § 1346(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

28 U.S.C. § 2671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2674 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 6

**STATE STATUTES**

Va. Code § 65.2-300(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Va. Code § 65.2-302(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Va. Code § 65.2-307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 4

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**FEDERAL REGULATIONS**

32 C.F.R. § 700.102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**PAGE**

## MISCELLANEOUS

H.R. REP. NO. 29-552 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vienna Convention on Diplomatic Relations*,
    Apr. 18, 1961, 23 U.S.T. 32227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6 *Larson's Workers' Compensation Law* § 113.01[1] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

82 *Am. Jur. Workers' Compensation* § 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(b)(1), the United States of America moves to dismiss this suit for lack of subject matter jurisdiction. As shown below, Plaintiff's Federal Tort Claims Act action is barred because, under the Virginia Workers' Compensation Act, Virginia's workers' compensation statute and Plaintiff's exclusive remedy, "a private individual under like circumstances" (28 U.S.C. § 2674) could not be liable to Plaintiff.

## BACKGROUND

Plaintiff, Mr. Hose, brings this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.* Compl. at ¶ 1. Plaintiff asserts that he was employed by LAM Associates, Inc., a private contractor, which assigned him to work as a "supervisor for the Department of State incoming diplomatic pouch and mail unit at State Annex 32 (SA-32) in Sterling, Virginia." Compl. at ¶ 6. The contract between LAM Associates, Inc., and the Department of State in effect in 2001 required that LAM Associates, Inc., maintain workers' compensation and liability insurance. Att. 1, Contract Excerpts. According to his Complaint, Plaintiff was injured when he inhaled Bacillus anthracis ("anthrax") spores that came from an envelope processed at the Department of State's diplomatic pouch and mail facility in Sterling, Virginia, in October 2001. Compl. at ¶ 7. This envelope, addressed to Senator Patrick Leahy at zip code 20510, was routed through the State Annex 32 facility when an optical reader misread the hand-written zip code as 20520. *Id.* Plaintiff seeks monetary damages for the "permanent affect [*sic*] on his physical and mental health" resulting from the alleged exposure to anthrax. Compl. at ¶ 33. Plaintiff has been receiving compensation pursuant to the Virginia Workers' Compensation Act. Compl. Exh. 1 at 3.

1

Plaintiff's three-count Complaint asserts claims of Strict Liability for Ultra-hazardous Activity (Count I), Negligence (Count II), and Negligence for the Cleaning of a Mail Sorting Machine (Count III). Specifically, Count I asserts a claim for "strict liability for ultra-hazardous activity" against the United States, alleging that the United States failed to adequately secure samples of anthrax kept for experimentation at its Fort Detrick military base in Maryland and at other facilities knowing that anthrax could potentially cause harm to humans.[1] Compl. at ¶¶ 9-12. Count II asserts that the United States was negligent in failing to secure samples of anthrax in its possession at Fort Detrick and other facilities. Compl. at ¶¶ 18-25. Count III asserts that the United States' manner of cleaning mail sorting equipment at the Department of State's Annex 32 facility in Sterling, Virginia, was negligent in that it caused the aerosolization of anthrax spores directly leading to Plaintiff's exposure and ensuing injuries. Compl. at ¶¶ 26-33. The United States does not minimize the devastating impact of the 2001 anthrax attacks as they may have affected Mr. Hose and other victims, and is conducting an ongoing criminal investigation into the attacks. As for the Complaint at issue in this case, all three counts of Plaintiff's Complaint are beyond the Court's subject matter jurisdiction and should be dismissed.

## APPLICABLE LEGAL STANDARDS

### I.    Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides that a cause of action should be dismissed if the court lacks "jurisdiction over the subject matter." Because federal courts are

---

[1] The Supreme Court has ruled that the United States cannot be held strictly liable for engaging in ultrahazardous activities under the FTCA. *Laird v. Nelms*, 406 U.S. 797 (1972); *Dalehite v. United States*, 346 U.S. 15 (1953). Count I of Plaintiff's Complaint should therefore be dismissed, for that reason alone.

2

courts of limited jurisdiction, the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). In general, courts must dismiss claims if subject matter jurisdiction is lacking. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998) (courts must resolve jurisdictional issues before considering the merits of a claim). "Because subject matter jurisdiction deals with the power of the court to hear the plaintiff's claim in the first place, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Fowler v. Dist. of Columbia*, 122 F. Supp. 2d 37, 40 (D.D.C. 2000) (citation omitted).

In ruling on a 12(b)(1) motion to dismiss, the court is not limited to the allegations in the complaint, but may consider materials outside of the pleadings. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003); *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992). Conversion to a motion for summary judgment under Federal Rule of Civil Procedure 56 is only required when the issues relating to the question of whether the court has jurisdiction are so intertwined with the facts necessary to resolve the merits of the suit that the court must treat the motion as one for summary judgment. *See Flores ex rel. J.F. v. Dist. of Columbia*, 437 F. Supp. 2d 22, 27-28 n.11 (D.D.C. 2006). In the instant case, the facts germane to the United States' assertion that dismissal is appropriate under Rule 12(b)(1) due to the exclusivity provision of the Virginia Workers' Compensation Act do not in any way implicate the merits of Plaintiff's cause of action. To resolve the United States' 12(b)(1) motion, this Court need only determine, for purposes of the Virginia Workers' Compensation Act, whether Plaintiff was engaged in the government's "trade, business or occupation" so that the United

3

States was his statutory employer. The Court need not delve into the merits of Plaintiff's Complaint regarding whether the United States was negligent and whether that negligence in any way caused Plaintiff's alleged injuries.

Where plaintiff's exclusive remedy arises out of a state workers' compensation statute, dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) is appropriate. *See Evans v. B.F. Perkins Co., a Div. of Standex Intern Corp.*, 166 F.3d 642, 652 (4th Cir. 1999) (affirming Rule 12(b)(1) dismissal of a negligence claim based on Virginia Workers' Compensation Act). *See also Stuart v. Colorado Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (holding that issue of whether exclusivity provision of a state's workers' compensation law deprived the court of subject matter jurisdiction was properly resolved under 12(b)(1)); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (affirming district court's dismissal of an FTCA case pursuant to 12(b)(1) where plaintiff's exclusive remedy was workers' compensation). Plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936); *Best v. United States*, 522 F. Supp. 2d 252, 254 (D.D.C. 2007); *Brady Campaign to Prevent Gun Violence v. Ashcroft*, 339 F. Supp. 2d 68, 72 (D.D.C. 2004).

## II.    Federal Tort Claims Act's Waiver of Sovereign Immunity

As a sovereign entity, "[t]he United States is immune from suit absent an express waiver of its sovereign immunity." *Kugel v. United States*, 947 F.2d 1504, 1506 (D.C. Cir. 1991). *See United States v. Sherwood*, 312 U.S. 584, 586-88 (1941); *Marshall v. Reno*, 915 F. Supp. 426, 434 (D.D.C. 1996). The FTCA provides a limited waiver of that sovereign immunity by allowing tort suits based upon the wrongful acts or omissions of federal employees acting within

4

the scope of their employment.  28 U.S.C. § 1346(b).  The FTCA's grant of subject matter

jurisdiction to district courts is limited to claims "for injury . . . under circumstances where the

United States, if a private person, would be liable to the claimant *in accordance with the law of*

*the place where the act or omission occurred.*"  *Id.* (emphasis added).  *See also* 28 U.S.C. § 2674

(The United States is liable under the FTCA "in the same manner and to the same extent as a

private individual under like circumstances.").

When actions alleged to give rise to an FTCA suit occur in multiple states, federal courts

must apply the "whole law," including the choice of law rules, of the state where the negligent

action or omission occurred.  28 U.S.C. §§ 1346(b), 2674; *Richards v. United States*, 369 U.S. 1,

11 (1962); *Smith v. United States*, 507 U.S. 197, 202 n.3 (1993).  Plaintiff alleges that wrongful

actions occurred in Maryland and Virginia, both of which adhere to the rule of *lex loci delicti*, or

the law of the "place of the wrong," under which  the substantive law to be applied is the law of

the state where "'the last event necessary to make an [actor] liable for an alleged tort takes

place.'"  *Spring v. United States*, 833 F. Supp. 575, 577 (E.D. Va. 1993) (quoting *Quillen v. Int'l*

*Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986)); *Erie Ins. Exchange v. Heffernan*, 399 Md.

598, 620 (Md. 2007) (under Maryland law, "[w]here the events giving rise to a tort action occur

in more than one State, [courts] apply the law of the State where the injury – the last event

required to constitute the tort [– ] occurred.").  Under the facts alleged by Plaintiff in his

Complaint, Virginia state law applies to his claims.

According to the Complaint, Plaintiff became ill approximately one week after being

exposed to anthrax at the Virginia facility.  Compl. at ¶¶ 7-8.  This was clearly the last event

necessary to make the alleged tort complete.  Therefore, under the FTCA, the United States can

5

only be held liable if Virginia state law would find a private individual liable under like

circumstances. *See* 28 U.S.C. § 2674; *Perry v. U.S.*, 882 F. Supp. 537, 539 (E.D. Va. 1995).

Because, as shown below, there is no analogous private liability under Virginia law, the suit

should be dismissed for lack of subject matter jurisdiction.

## ARGUMENT

## I.    The Virginia Workers' Compensation Act Bars Plaintiff's Suit

Plaintiff asserts that he was injured while working for a private employer at a federal

government facility located in Virginia.  Compl. at ¶ 6.  Under Virginia law, the United States is

Plaintiff's "statutory employer" and is thus immune from suit because the Virginia Workers'

Compensation Act (VWCA) is Plaintiff's sole and exclusive remedy for his alleged injuries.

The relevant section of the VWCA provides:

**Statutory employer**

When any person (referred to in this section as "owner") undertakes to perform or
execute **any work which is a part of his trade, business or occupation** and
contracts with any other person (referred to in this section as "subcontractor") for
the execution or performance by or under such subcontractor of the whole or any
part of the work undertaken by such owner, the owner shall be liable to pay to any
worker employed in the work any compensation under this title which he would
have been liable to pay if the worker had been immediately employed by him.

Va. Code § 65.2-302(A) (emphasis added).  In short, an owner has statutory employer status

when the injured worker was engaged in any activity that was part of the owner's "trade, business

or occupation." *Perry*, 882 F. Supp. at 539.  The "statutory employer" provision prevents such

owners from escaping liability for workers' compensation by constantly having others perform

their work. *Jones v. Commonwealth*, 267 Va. 218, 222 (2004).

The VWCA is to be liberally construed to further its remedial purpose. *Pendley v. United*

6

*States*, 856 F.2d 699, 702 (4th Cir. 1988). The essential purpose of the VWCA is to "give compensation for accidental injuries resulting from the hazards of employment," and typical cases addressing the VWCA are cases in which an injured worker seeks coverage. *Henderson v. Central Telephone Co. of Va.*, 233 Va. 377, 382 (1987). Despite the fact that in the case before this Court, it is the defendant asserting application of the VWCA, the analysis is no different than if the plaintiff were asserting coverage under the VWCA. *See Id.*

If a defendant is determined to be a statutory employer, all provisions of the VWCA apply, including the VWCA's exclusivity provision, which bars common law tort actions brought by employees. The exclusivity provision states:

> The rights and remedies herein granted to an employee when his employer and he have accepted the provisions of this title respectively to pay and accept compensation on account of injury or death by accident shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin, at common law or otherwise, on account of such injury, loss of service or death.

Va. Code § 65.2-307. Thus, "[w]hen an employee is eligible for remedy under the Act, he or she may not seek any other remedy against the [statutory] employer or his fellow employees." *Jones*, 267 Va. at 222. Coverage under the VWCA is not elective as all employers and employees are presumed to have accepted its provisions. Va. Code § 65.2-300(A).

In the instant matter, the United States, if it were a private party, would possess statutory employer status. When an entity operates pursuant to statutes or regulations, the Virginia Supreme Court has made it clear that the test to be applied to determine statutory employer status is the one set forth in *Henderson*, 233 Va. at 382-83, addressing the status of a public utility. The Virginia Supreme Court stated that when such entities are involved, "[w]e have consistently

7

considered the laws under which they were created and under which they functioned in determining their trade, business or occupation." *Id.* at 383-84. For governmental entities and public utilities, "it is not simply what they do that defines their trade, business or occupation. What they are **supposed to do** is also a determinant." *Id.* at 383 (emphasis added). *See also Roberts v. City of Alexandria*, 246 Va. 17, 19 (1993) (stating that a governmental entity's trade or business is defined by what it is "authorized or empowered" to do). Thus, "[a]ny activity which a government entity is authorized or required to do is its trade, business or occupation." *Perry*, 882 F. Supp. at 539. [2]

In *Best v. Washington Metrop. Area Transit Auth.*, 822 F.2d 1198 (D.C. Cir. 1987), the District of Columbia Circuit applied the *Henderson* test to the VWCA to determine statutory employer status. In *Best*, the court explained that the Washington Metropolitan Area Transit Authority (WMATA) was "charged with the operation and maintenance of a mass transit system." *Id.* at 1199. Specifically, the WMATA had the responsibility "to plan, develop, finance and cause to be operated improved transit facilities . . . utilizing to their best advantage the various modes of transportation . . . ." *Id.* at 1202 (citing WMATA Compact § 2, 80 Stat. 1325). The plaintiff was a privately employed mechanic who was injured while changing escalator light

---

[2]A different test is applied to private entities which are not governed by statutes or regulations. *See Shell Oil Co. v. Leftwich*, 212 Va. 715 (1972). The Fourth Circuit has squarely addressed any concerns that application of a different test to governmental entities runs afoul of the FTCA's requirement that there be analogous private liability. In *Pendley,* 856 F.2d at 702, the Fourth Circuit stated, "it is clear that in Virginia, under *Henderson*, if a private individual operates a business regulated by statute or regulation, what is 'a part of his trade, business or occupation' is determined by the statutes and regulations under which he operates. Thus, the [federal agency] as a private individual, operating under statutes and regulations as it does in the development of space weapons systems, is no less an employer under [the VWCA] than was the private telephone company operating under statutes and regulations in *Henderson*."

bulbs at a Virginia location. *Id.* In applying *Henderson* to determine whether the WMATA was plaintiff's statutory employer under the VWCA, the D.C. Circuit noted that its analysis did not turn on whether the plaintiff's task was essential to the WMATA's responsibility to operate a mass transit system. *Id.* The D.C. Circuit went on to state that, "[n]one of the controlling Virginia cases suggests that an activity must be absolutely essential to the agency's mission in order to constitute part of its trade or business. To the contrary, *Henderson's* fundamental principles favoring liberal interpretation of trade or business seem to preclude any such essentiality requirement." *Id.*

The VWCA's exclusivity provision has been held to bar a number of FTCA suits brought by private contractor employees who were allegedly injured on the job in Virginia because the injured party was engaged in the United States' "trade, business or occupation" as determined by what the government was required or authorized to do by relevant statutory or regulatory provisions. *See, e.g., Pendley*, 856 F.2d at 700-02 (holding Air Force to be statutory employer of private worker killed in a rocket fuel explosion); *Nelson v. United States Postal Service*, 189 F. Supp. 2d 450, 454-59 (W.D. Va. 2002) (Postal Service found to be statutory employer of a private truck driver who was carrying mail when allegedly injured); *Perry*, 882 F. Supp. at 538-40 (Navy held to be statutory employer of private employee of aircraft manufacturer when employee was burned while working on Navy aircraft).

In *Hyman v. United States*, 796 F. Supp. 905, 906 (E.D. Va. 1992), the court held the Navy to be the statutory employer of a private worker whose government contractor employer assigned him to install insulation on a Navy ship docked at a Naval base. Plaintiff alleged he was injured on the Naval base in an auto accident when his supervisor, also a private employee, told

9

him to move his car after he reported for duty. *Id.* The court stated that the functions of the United States Navy were governed by a number of statutes and regulations and that the Secretary of the Navy was responsible for a long list of items, including recruitment, organizing, servicing, and mobilizing. *Id.* at 907 (citing 10 U.S.C. § 5013(b)). The court found that the fundamental objectives of the Navy were to "organize, train, equip, prepare, and maintain the readiness of the Navy and to support Navy . . . forces . . . ." *Id.* (citing 32 C.F.R. § 700.102). The Navy was found to be plaintiff's statutory employer because "the focus for determining statutory employer status is on the Navy **as a whole**," so that even though plaintiff was not carrying out his contractual duties at the time of his accident, he was primarily present to install insulation and that activity was part of the "ordinary operational and readiness concern of the United States Navy." *Id.* at 908 (emphasis added).

*Coulter v. United States*, 256 F. Supp. 2d 484 (E.D. Va. 2003), is the most recent reported FTCA case in which the VWCA was invoked. That case involved an employee of a private food service contractor for the Marine Corps who brought an FTCA action for burns allegedly suffered while preparing food at a Marine Corps base. *Id.* at 486-87. The court stated that the issue was "whether the work performed by plaintiff, namely the cooking of meals to be served at [the base], constitutes part of the Marine Corps' 'trade, business or occupation.'" *Id.* at 489. The court found that the Marine Corps was required by statute to provide meals to the men and women enlisted in the Corps. *Id.* at 487. In addition, internal regulations and orders of the Department of Defense and Marine Corps were found to "govern the provision of meals and the operation of Marine Corps mess halls." *Id.* (citing Marine Corps Order 10110.34E (1992)). Determining the Marine Corps' "trade, business or occupation" by analyzing what it was

10

authorized to do, the court held that the Marine Corps had statutory employer status because plaintiff's work was in furtherance of the Marine Corps' food service business and, thus, the FTCA action was barred by the VWCA's exclusive remedy provision. *Id.* at 490.

Federal agencies have been held to be the statutory employer under Virginia law when the activity in which the private worker plaintiff was engaged had a far more tangential relationship to the defendant's "trade, business or occupation" than in the instant case, which involved the processing of the Department of State's diplomatic pouch and mail. For example, in *Muldrow v. United States*, (4th Cir. 1992) 972 F.2d 341 (TABLE) (per curiam), 1992 WL 200866 (4th Cir. August 14, 1992), a case cited by *Hyman*, 796 F. Supp. at 909, the government was held to be the statutory employer of a private worker who was trimming weeds when he fell into a hole and suffered burns. The Fourth Circuit relied on the fact that the Navy had issued regulations that gave the Commander of the Naval Base absolute responsibility for base maintenance. *Muldrow*, 1992 WL 20866 at *1. In carrying out that responsibility set forth in internal Naval regulations, the Commander issued "standards of appearance directives that required the weed-trimming activities in which [plaintiff] was engaged when he suffered his injury." *Id.* The Fourth Circuit held that the standards of appearance directives were related to the Commander's overall responsibility for maintenance of the base and therefore were part of the Navy's "trade, business or occupation" and that, consequently, the government had statutory employer status. *Id.*

In the case before this Court, Plaintiff was employed by a private contractor to serve as a supervisor in the Department of State's Annex 32 facility in Virginia at its incoming diplomatic pouch and mail unit. Compl. at ¶ 6 and Compl. Exh. 1 at 1. Looking at the Department of State as a whole, it is clear that processing the diplomatic pouch and mail it receives is something that

11

the Department of State is required and authorized to do as part of its "trade, business or occupation" – *i.e.*, managing the nation's foreign affairs. The Department of State's authority for processing its own mail derives from the Secretary of State's basic authority, delegated by the President of the United States, to formulate and execute the foreign policy of the United States. Indeed, Congress explicitly requires the Department of State, through the Secretary of State, to "perform such duties as shall from time to time be enjoined or entrusted to him by the President relative to **correspondences**, commissions, or instructions to or with public ministers or consuls from the United States . . . ." 22 U.S.C. § 2656 (emphasis added).[3]

When the Department of Foreign Affairs (predecessor to the Department of State) was created, Congress mandated:

> That the correspondence and communications with the ministers, consuls and agents of the United States, in foreign countries, and with the ministers and other officers of foreign powers with Congress, be carried on through the office of foreign affairs [renamed the Department of State in September 1789] by the said Secretary, who is also empowered to correspond with all other persons from whom he may expect to receive useful information relative to his department . . .

---

[3]The general authorities of the Secretary of State that are relevant in this case include the authority to administer the Department of State and the Foreign Service under 22 U.S.C. §§ 2651(a), 3921 and 3926. The Secretary is authorized to "promulgate such rules and regulations as may be necessary to carry out the functions of the Secretary of State and Department of State" and may delegate this authority unless otherwise specified by law. 22 U.S.C. § 2651(a). The "administrative operations of the Department" are included as one of the functions so delegated. Att. 6, 1 FAM 014.3a(2)(f). The Undersecretary for Management is responsible for the "organization, operations, and the assignment of functions within the Department" (1 FAM 044.1) and has oversight over the Bureau of Administration (1 FAM 044.3), which is charged with processing correspondence through the Diplomatic Pouch and Mail Division (1 FAM 215.4-4). Att. 6. Plaintiff's employer, LAM Associates, Inc., conducts that function pursuant to contract with the Department of State. Att. 1, Contract Excerpts. *See generally Telenor Satellite Services, Inc. v. United States*, 71 Fed.Cl. 114, 122 (Fed.Cl. 2006) ("The Secretary of State clearly has the authority to bind the Government in contract in order to fulfill the duties of the Department, as determined by the President of the United States. *See* 22 U.S.C. § 2656.").

1 Statutes at Large 28, note (a).

The processing of its domestic and overseas mail has always been given equal priority in carrying out the Department of State's business. Att. 2, Hove Decl. ¶ 5. Initially, this was done because a number of functions the Department of State was required to handle for the country relied on domestic mail service. *Id.* For example, the Department of State issued patents and corresponded with governors. *Id.* Going back to the 1800s, the Chief Clerk was required "to assist the Secretary in inspecting the letters which are daily received." Att. 3, NATALIA SUMMERS, DIVISION OF STATE DEPARTMENT ARCHIVES, OUTLINE OF THE FUNCTIONS OF THE OFFICES OF THE DEPARTMENT OF STATE 45 (1943). The Chief Clerk was required to receive the daily mail, read it and distribute it to the Assistant Secretaries or clerks as appropriate. *Id.* at 46; H.R. REP. NO. 29-552, at 52 (1846); *See* Att. 2, Hove Decl. ¶¶ 6-7. By the early 1900s, "[a]ll incoming and outgoing diplomatic pouch mail, as well as the domestic and other mail matter, [was] handled by this section." Att. 3, NATALIA SUMMERS at 51. All mail pouches were required to be opened upon arrival in the Department so that the official mail could be delivered immediately. *Id.*; Att. 4, Register of the Department of State, Regulations of the Department of State 1871 at ¶¶ VI, VII; *See* Att. 2, Hove Decl. ¶ 8. As the volume of correspondence the Department of State had to process increased, the Mail Section was created in 1911. Att. 2, Hove Decl. ¶ 9. The Diplomatic Pouch and Mail Division (DPM), the present day version of that section, was created in approximately 1985. Att. 2, Hove Decl. ¶ 10.

In the modern era, the DPM, in which Plaintiff's employer assigned him to work, has been responsible for supporting the Secretary of State's duty of processing correspondence. "The diplomatic pouch transports items for official use of the Mission across international frontiers

13

without procedural delay and without inspection by foreign government officials." Att. 5,

Foreign Affairs Handbook Excerpts, 14 FAH-4 H-511(a). The necessity of having such a system

in place was recognized in the *Vienna Convention on Diplomatic Relations*, Apr. 18, 1961, 23

U.S.T. 32227, ratified by Congress. "In communicating with the Government and the other

missions and consulates of the sending State, wherever situated, the mission may employ all

appropriate means, including diplomatic couriers and messages. . . ." *Vienna Convention*, Art.

27(1). "The official correspondence of the mission shall be inviolable. Official correspondence

means all correspondence relating to the mission and its functions. The diplomatic bag shall not

be opened or detained." *Id.* Art. (27) 2-3.

The Foreign Affairs Manual (FAM) establishes "[t]he functional statements or

organizational responsibilities and authorities assigned to each major component of the

Department . . . ." Att. 6, FAM Excerpts, 1 FAM 011.1. The FAM is the "formal written

document for recording, maintaining, and issuing Department directives." *Id.* at 2 FAM 1114.

The Foreign Affairs Handbook (FAH) is a supplement to the FAM and "provides implementing

guidelines and detailed procedures for directives contained in the FAM." *Id.* As set forth in the

FAM, the DPM is "[r]esponsible for the Department's unclassified pouch and mail services" and

"[a]dministers the domestic classified pouch and mail operations for the Department of State and

prepares classified pouches for delivery abroad." *Id.* at 1 FAM 216.2-4.[4] "The Diplomatic

Pouch and Mail Division is responsible for the collection, screening, sorting and distribution of

U.S. mail, parcels and commercial shipments for both classified and unclassified material

---

[4]This is the citation to the relevant section of the FAM as it existed in 2001. The
language now appears at 1 FAM 215.4-4.

14

destined to and sent from U.S. missions abroad, including embassies and consulates. It is also responsible for the collection, screening, sorting and distribution of correspondence addressed to the Department of State Headquarters and its domestic annexes." Att. 7, Keitz Decl. ¶ 6. The DPM also has responsibility for acting "as liaison to the U.S. Postal Service and Military Postal Servicing Agency." Att. 6, 1 FAM 215.4-4. Over one hundred posts (consulates or embassies), lacking access to the U.S. Postal Service, rely solely on the Department of State's diplomatic pouch and mail system. Att. 5, 14 FAH 4 H-518.2(a); Exhibit H-518A. The Department of State's Annex 32 facility is the "primary facility that processes unclassified diplomatic pouch mail, parcels and domestic mail . . . ." Att. 7, Keitz Decl. ¶ 7. That facility processed approximately 14,000,000 letters and flats, envelopes slightly larger than traditional letter envelopes, in 2007. *Id.* ¶ 8. Thus, processing its mail is a part of the Department of State's "trade, business or occupation" as defined by the laws under which it was created and functions. *See Henderson*, 233 Va. at 383-85.

In the instant case, the activity in which Plaintiff was engaged was in direct support of the business of the government. Just as the private employee preparing food to be served to enlisted members of the Marine Corps, and a weed-trimmer maintaining standards of appearance on a Navy base were held to be engaged in the "trade, business or occupation" of the government based on statutes and agency regulations requiring that it provide meals to its members (*Coulter*, 256 F. Supp. 2d at 493), and regulations relating to base maintenance (*Muldrow*, 1992 WL 200866 at *1), the Plaintiff in this case was engaged in the "trade, business or occupation" of the Department of State. There can be no doubt that his work as a supervisor in the DPM, where incoming diplomatic pouch and mail is processed, served to support the Secretary of State in

15

discharging his duty to process correspondence as required by 22 U.S.C. § 2656 as well as the regulations and rules previously cited. The United States is therefore Plaintiff's statutory employer, and his FTCA suit must be dismissed based on the VWCA's exclusive remedy provision.

## II.    The Dual Capacity Doctrine Is Not Recognized In Virginia

Plaintiff may attempt to circumvent the VWCA's exclusivity provision by arguing that it can only bar his claims with respect to what occurred at the Department of State and that his allegations pertaining to government actions at Fort Detrick in Maryland are not barred. Such an argument would be tantamount to the "dual capacity" doctrine which, in some jurisdictions, allows plaintiffs to sue their employers, or statutory employers, in tort on the theory that the employer has a second identity so completely separate from and unrelated to its status as plaintiff's employer that the law would recognize it as a separate legal entity. *See* 6 *Larson's Workers' Compensation Law* § 113.01[1]. The doctrine has also been applied to cases when a plaintiff claims that a product manufactured by his employer for public distribution injured him while working and to cases in which the employer's provision of medical care was distinct from its role as an employer. 82 *Am. Jur. Workers' Compensation* § 55. However, the doctrine would not be available in the instant case.

The dual capacity doctrine, recognized in only a few jurisdictions, has never been adopted in Virginia. One of the few Virginia cases to address the "dual capacity" doctrine is *Kast v. PPG Industries, Inc.*, 664 F. Supp. 237 (W.D. Va. 1987), where the court stated:

> The plaintiff urges the court to apply the dual capacity doctrine here . . . .
> Although no Virginia case or statute expressly dismisses or approves of the
> doctrine, the plaintiff argues that the court may infer Virginia's acceptance of the
> doctrine from other cases and statutes. The court, however, is unwilling to fill in

16

the blanks in the state's workers' compensation scheme . . . .

By removing employer-manufacturers from the canopy of protection they now receive when they compensate employees according to the Act, the court's approval of the dual capacity doctrine would reshape the purpose of the state's worker's compensation scheme. It is only appropriate that such a fundamental restructuring of the statutory compensation scheme should come either by the decision of the Virginia state courts or by the Virginia legislature, not by a federal court . . . . Moreover, the court is persuaded . . . by the great majority of cases that conclude that the dual capacity doctrine is inconsistent with a reliable workers' compensation system . . . . The court will not apply the dual capacity doctrine without an express acceptance of the doctrine by the Virginia courts or the legislature.

*Id.* at 240-41. *See also Horne v. General Electric Co.*, 716 F.2d 253, 254 (4th Cir. 1983) (noting that the "dual capacity" doctrine was only recognized in a minority of states and declining to adopt the doctrine where the state workers' compensation and state courts were silent on the matter). Since Virginia legislature and state courts have not adopted the "dual capacity" doctrine, there is no basis for its application to this case.[5]

## CONCLUSION

This action arises out of an employment relationship in which the United States, if a private individual, would be deemed Plaintiff's statutory employer under the Virginia Workers' Compensation Act. The United States is Plaintiff's statutory employer and the exclusive remedy provision of the Virginia Workers' Compensation Act therefore serves to bar Plaintiff's suit

---

[5]Virginia's workers' compensation law is similar to Federal law in this respect. Cf. *Wilder v. United States*, 873 F.2d 285, 287-89 (11th Cir. 1989) (exclusive remedy provision of a federal workers' compensation statute bars suit against the United States by an employee of a federal instrumentality for injuries allegedly caused by another federal agency); *Williams v. Gen. Services Admin.*, 582 F. Supp. 442, 444 (E.D. Pa. 1984) (Federal Employees Compensation Act (FECA) bars suit by former Navy employee who alleged negligence by other federal agencies causing work-related injuries); *Scalia v. United States*, 475 F. Supp. 1040 (S.D.N.Y. 1979) (FECA bars suit by postal worker injured on the job seeking damages from the Public Health Service, which allegedly provided negligent treatment).

against the United States. Because Plaintiff cannot satisfy his burden of proving subject matter

jurisdiction, this suit should be dismissed.

Dated: <u>March 3, 2008</u>                    Respectfully Submitted,


                                              _____/s/_____

JEFFREY BUCHOLTZ                              KIRSTEN L. WILKERSON (MO Bar #49082)
Acting Assistant Attorney General            Trial Attorney
Civil Division                               Torts Branch (Environmental Torts)
                                             United States Department of Justice
C. FREDERICK BECKNER, III                    1331 Pennsylvania Ave., NW
Deputy Assistant Attorney General            Suite 8014 South
Civil Division                               Tel: (202) 353-7750/Fax: (202) 616-4473
                                             Kirsten.wilkerson@usdoj.gov
J. PATRICK GLYNN
   D.C. Bar #219162                          CHRISTINA M. FALK
Director Environmental Torts                 Senior Trial Counsel

DAVID FISHBACK                               JASON S. PATIL
   D.C. Bar #182907                          Trial Attorney
Assistant Director Environmental Torts

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2008, I caused a copy of the foregoing Motion to

Dismiss to be served by Federal Express and through Electronic Case Filing on counsel for the

plaintiff:

Leslie D. Hershfield, Esquire
Schulman, Treem, Kaminkow, Gilden & Ravenell, P.A.
The World Trade Center, Suite 1800
401 East Pratt Street
Baltimore, MD 21202
(410) 332-0850

_____/s/_____

KIRSTEN L. WILKERSON (MO Bar # 49082)
Trial Attorney
Torts Branch (Environmental Torts)
United States Department of Justice
1331 Pennsylvania Ave., NW
Suite 8014 South
Tel: (202) 353-7750/Fax: (202) 616-4473
Kirsten.wilkerson@usdoj.gov

**ATTACHMENT  1**

**CONTRACT EXCERPTS**

| CONTRACT | | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | | N/A | | PAGE 1 | OF PAGES 42 |
|---|---|---|---|---|---|---|---|

| 2. CONTRACT (Proc. Inst. Ident.) NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. PROJECT NO. |
|---|---|---|
| S-OPR-98-D-0003 | January 1, 1998 | |

**5. ISSUED BY**  CODE

U. S. Department of State
Office of Acquisition
P.O. Box 9115, Rosslyn Station
Arlington, VA  22219

**6. ADMINISTERED BY (If other than Item 5)**  CODE

**7. NAME AND ADDRESS OF CONTRACTOR (No. street, county, state and ZIP Code)**

LAM Associates, Inc.
8245 Boone Boulevard, Ste.200
Vienna, Virginia 22182

DUN 038792495   TIN 541085493

CODE            FACILITY CODE

**8. DELIVERY**
☐ FOB ORIGIN   ☒ OTHER (See below)  Destination

**9. DISCOUNT FOR PROMPT PAYMENT**

**10. SUBMIT INVOICES** (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN:  ► ITEM G.2

**11. SHIP TO/MARK FOR**  CODE

U.S. Department of State, Attn M. McCaffrey
A/IM/RM/DPM/UPM, SA-32
Washington, DC 20522-3201

**12. PAYMENT WILL BE MADE BY**  CODE

U.S. Department of State
Office of Fiscal Ops-Vendor Claims, P.O. Box 9487,
Rosslyn Sta. Arl., Va. 22219-9487

**13. AUTHORITY FOR USING OTHER FULL AND OPEN COMPETITION:**
☐ 10 U.S.C. 2304(c)(    )   ☐ 41 U.S.C. 253(c)(    )

**14. ACCOUNTING AND APPROPRIATION DATA**

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| 0001 | Diplomatic Mail and Pouch | 12 | Mo | $198,887.00 | $2,386,644.00 |

This contract is awarded subject to the availability of FY 1998 appropriated funds. No
legal liability on the part of the Government for any payment may arise for performance
under this contract until funds are made available to the Contracting Officer for
performance and until the Contractor receives notice of availability to be confirmed
in writing by the Contracting Officer.

| | | **15G. TOTAL AMOUNT OF CONTRACT** ► | $2,386,644.00 |
|---|---|---|---|

### 16. TABLE OF CONTENTS

| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | **PART I - THE SCHEDULE** | | | | **PART II - CONTRACT CLAUSES** | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 1-17 |
| X | B | SUPPLIES OR SERVICES AND PRICE/COST | 1-7 | | | **PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH.** | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 1-13 | X | J | LIST OF ATTACHMENTS | 1-14 |
| X | D | PACKAGING AND MARKING | 1 | | | **PART IV - REPRESENTATIONS AND INSTRUCTIONS** | |
| X | E | INSPECTION AND ACCEPTANCE | 1-7 | X | K | REPRESENTATIONS, CERTIFICATIONS | |
| X | F | DELIVERIES OR PERFORMANCE | 1-3 | | | AND OTHER STATEMENTS OF OFFERORS | |
| X | G | CONTRACT ADMINISTRATION DATA | 1-5 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 1-8 | | M | EVALUATION FACTORS FOR AWARD | |

### CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

**17.** ☒ **CONTRACTOR'S NEGOTIATED AGREEMENT** (Contractor is required to sign this document and return 3 copies to issuing office.)
Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

**18.** ☐ **AWARD** (Contractor is not required to sign this document.) Your offer on Solicitation Number _____
including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

**19A. NAME AND TITLE OF SIGNER** (Type or print)

MASON L MUSHAW, V. PRESIDENT

**20A. NAME OF CONTRACTING OFFICER**

Robert Powell

| 19B. NAME OF CONTRACTOR | 19C. DATE SIGNED | 20B. UNITED STATES OF AMERICA | 20C. DATE SIGNED |
|---|---|---|---|
| (Signature of person authorized to sign) *Mason L. Mushaw* | 11-25-97 | BY (Signature of Contracting Officer) | 11/25/97 |

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

26-107

**STANDARD FORM 26** (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

DOS-00503

S-OPRAQ-98-D-0003

---

SECTION C, DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

## C.1    GENERAL

**a.    INTENTION.**  It is the intention of this solicitation to obtain mail processing and handling service for the Department of State's Office of Information Management's Diplomatic Pouch and Mail Division (DPM) through a combination firm-fixed price, labor hour contract.

**b.    BACKGROUND.**  The Diplomatic Pouch and Mail Division is the official conveyance for the movement of U. S. Government correspondence for the Department of State (DOS).  DPM processes more than 150,000 items daily through the efficient and effective use of the letter sorting systems consisting of parcel sorters, optical character reader sorters, and bar code sorters.

**c.  DPM DIVISION STRUCTURE.**

(1)    Unclassified Pouch and Mail Branch

    (a)    Acceptance Section
        (i)    Loss Mail Unit
        (ii)    Pouch Unit
        (iii)    Loose Registered Mail Unit
        (iv)    Non-conveyable Unit
        (v)    Prime Sort Unit
        (vi)    Prime Registered Sort Unit

    (b)    Sortation Section
        (i)    Letter Sorting Unit
        (ii)    Keying Unit
        (iii)    Bundling Unit
        (iv)    Flat Sorting Unit
        (v)    Registered Letter Sorting Unit
        (vi)    Registered Bundling Unit
        (vii)    Registered Flat Sorting Unit
        (viii)    Registered Parcel Sorting Unit
        (ix)    Parcel Sorting Unit

    (c)    Dispatch Section
        (i)    Miscellaneous Dispatch Unit
        (ii)    Messenger System Dispatch Unit
        (iii)    Postage Meter Unit
        (iv)    USPS Dispatch Unit
        (v)    Pouch Closing Unit
        (vi)    Air Cargo Dispatch Unit

DOS-00511

S-OPRAQ-98-D-0003

## SECTION H, SPECIAL CONTRACT REQUIREMENTS

### H.1  GOVERNMENT-FURNISHED EQUIPMENT AND SPACE (ON-SITE) (05/95)

For Contractor personnel performing work on Government premises, the Government shall provide:  on-site office space, furniture, telephone service, and any other necessary supplies and equipment.

### H.2  GOVERNMENT-FURNISHED PROPERTY (05/95)

Notwithstanding any term or condition of this contract to the contrary, the Government will provide only that property set forth below for use in the performance of this contract.

| DESCRIPTION | QUANTITY | DATE |
|---|---|---|
| Bunn & Strapex Tying Machine | 2 | 1 Oct 97 |
| Parcel/Letter Sorter | 1 | 1 Oct 97 |
| Optical Character Reader Model 841 Operations | 1 | 1 Oct 97 |
| Bar Code Sorter Model 870 | 1 | 1 Oct 97 |
| Wang VS-6000 Central Processor | 1 | 1 Oct 97 |
| Wang 4230A Work-Stations | 30 | 1 Oct 97 |
| Wang Laser Princers | 8 | 1 Oct 97 |
| Wang Band Printer | 1 | 1 Oct 97 |
| Clark Fork-lift Model 300-30NP | 1 | 1 Oct 97 |
| Clark Fork-lift Model PWD-258 | 1 | 1 Oct 97 |
| Clark Fork-lift Model NP300-D-40 | 1 | 1 Oct 97 |

### H.3  INSURANCE REQUIREMENTS (05/95)

In accordance with FAR 52.228-5 "INSURANCE–WORK ON A GOVERNMENT INSTALLATION," the Contractor shall, at no additional expense to this contract, provide and maintain, in addition to any other insurance coverage required elsewhere in this contract, the following types of insurance in the amounts specified.  Before commencing work under this contract, the Contractor shall certify to the Contracting Officer in writing, that at least the kinds and minimum amounts of insurance required below have been obtained.

DOS-00540

S-OPRAQ-98-D-0003

(a)    <u>Workers' Compensation and Employer's Liability</u>--The Contractor is required to comply with applicable Federal and State workers' compensation and occupational disease statutes. If occupational diseases are not compensable under those statutes, they shall be covered under the employer's liability section of the insurance policy, except when contract operations are so commingled with a Contractor's commercial operations that it would not be practical to require this coverage. Employer's liability coverage of at least $100,000 is required, except in States with exclusive or monopolistic funds that do not permit worker's compensation to be written by private carriers.

(b)    <u>General Liability</u>--The Contractor shall provide bodily injury liability insurance coverage written on the comprehensive form policy of at least $500,000 per occurrence.

(c)    <u>Automobile Liability</u>--The Contractor shall provide automobile liability insurance written on the comprehensive form of policy. The policy shall provide for bodily injury and property damage liability covering the operation of all automobiles used in connection with performing the contract. Policies covering automobiles operated in the United States shall provide coverage of at least $200,000 per person and $500,000 per occurrence for bodily injury and $20,000 per occurrence for property damage. The amount of liability coverage on other policies shall be commensurate with any legal requirements of the locality and sufficient to meet normal and customary claims.

(d)    <u>Aircraft Public and Passenger Liability</u>--When aircraft are used in connection with performing the contract, the Contractor shall provide aircraft public and passenger liability insurance. Coverage shall be at least $200,000 per occurrence for property damage. Coverage of passenger liability bodily injury shall be at least $200,000 multiplied by the number of seats or passengers, whichever is greater.

(e)    <u>Vessel Liability</u>--When contract performance involves use of vessels, the Contractor shall provide vessel collision liability and protection and indemnity liability insurance.

## H.4  KEY PERSONNEL (02/96)

(a)  The Contractor shall assign to this contract the following key personnel:

<u>LABOR CATEGORY</u>                    <u>NAME</u>

Project Manager

(b)    The Contractor agrees to assign to the performance of this contract those labor categories specified as key personnel in Section C. paragraph C.5 of this

DOS-00541

**ATTACHMENT 2**


**MARK HOVE DECLARATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID R. HOSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-01805 PLF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | DECLARATION OF |
| Defendant. | ) | MARK HOVE |
| | ) | |

## DECLARATION OF MARK HOVE

I, Mark Hove, do hereby declare the following:

1. My name is Mark Hove.

2. I currently reside in Baltimore, Maryland and am a historian in the Office of the
Historian, Bureau of Public Affairs, of the Department of State.  I have been a historian with the
Department of State, as either a contractor or full-time employee, since 2004.

3. As a member of the Policy Studies division, my primary duties are to conduct research
for and prepare policy-related studies, narratives on historical subjects, historical background
memoranda, and other works, as requested by other components of the Department of State; to
make appropriate use of the records of the Department of State, of other U.S. Government
agencies, and of published sources in the preparation of studies, memoranda, and works; to
respond to reference questions and background information requests from other Department of
State components (including U.S. Embassies and Consulates), the White House, the NSC, other
U.S. Government agencies, professors, non-governmental organizations, U.S. citizens, and
nationals of other nations.

4. From 2004 to 2008, I have been preparing an extensive history about diplomatic
security measures that U.S. diplomats and the Department of State used from the American
Revolution to 2001.  A key component of that study focuses on the security measures that the
Department of State developed and implemented with respect to its handling of its
correspondence.  As a result of that research project, plus additional research conducted in
January and February 2008, I am very familiar with how the Department of State has processed
its diplomatic and domestic correspondence.

5. Since its inception, and for much of the 19th century, the Department of State treated

its domestic mail with equal priority as its overseas mail. This was done for a number of historic reasons. For several decades, the Department of State possessed several important domestic functions that relied upon domestic mail service. Some of these functions included issuing letters of patent, conducting and printing the U.S. Census, and corresponding with governors of the states. The Department of State also received letters from U.S. Congressmen or citizens regarding U.S. diplomatic and trade affairs, and received letters from U.S. citizens on such consular issues such as obtaining a passport or settling the estate of a U.S. citizen who passed away overseas.

6. Historically, receipt and handling of all mail, domestic and overseas, fell to the Chief Clerk of the Department. When Congress created the Department of State in 1789, it directed that the Chief Clerk have "the charge and custody of all records books, and papers appertaining to the said department." 1 Statutes at Large, 28. In so stating, Congress was actually describing a position that already existed in the Department of Foreign Affairs.

7. As the second-ranking officer of the Department of State (until 1853), the Chief Clerk was responsible for the supervision of Department personnel, distribution of correspondence, and the day-to-day operations, which included recording all letters received and supervising the mail services. From the first days of the Department, all letters – domestic or overseas – were recorded, and, for many years, this was done in letterbooks. As reported to Congress in 1846, the Chief Clerk, under the direction of the Secretary of State, "receives the mails, opens and peruses despatches and other communications as they come in, and refers them to the appropriate clerks, . . . draughts letters, or gives direction in regard thereto, and generally in regard to all points arising in the course of the business of the department." House of Representatives, 29th Congress, 1st Session Report No. 552 (to accompany bill H.R. No. 376), p. 5.

8. After the Civil War, Secretary of State Hamilton Fish imposed new rules and regulations regarding the Department's mail. The business of the Department had grown as U.S. trade and diplomatic relations had expanded to many parts of the world. On January 3, 1871, Secretary Fish issued regulations requiring, "The pouches containing the mail shall be opened immediately upon their arrival in the Department, and the official mail delivered without delay to the index clerks." The Secretary also required that "Dispatches and letters received must be acknowledged at the earliest practicable moment, after their receipt . . . ." Rules and Regulations of the Department of State, issued by Secretary of State Hamilton Fish, January 3, 1871, *Register of the Department of State*, 1871, Paragraphs VI and VIII respectively, p. 10.

9. After the Civil War, the quantity of mail that the Department of State received rapidly grew, but the Department still treated domestic and overseas letters, as well as telegrams, with roughly equal priority. A single mail clerk in 1869 soon expanded to two mail clerks plus a four-person Bureau of Indexes and Archives in 1873. *Register of the Department of State for the Year 1869-1870* (Washington: USGPO, 1869), p. 7; and *Register of the Department of State* (Washington: USGPO, 1873), pp. 8-9. By 1911, the Department had a Mail Section, consisting of a chief and six employees, which handled more than 250,000 pieces of domestic mail, 1,447 outgoing diplomatic pouches, and 1,204 incoming diplomatic pouches. The Mail Section passed all letters to the 25 clerks of the Bureau of Indexes and Archives, where "[p]ractically the entire

department mail is opened." Department of State, *Outline of the Organization and Work of the Department of State* (Washington DC: USGPO, 1911), pp. 79-82.

10.   A review of historical Department of State records, registers, and phone books reveals that the Department of State underwent many changes since 1920; however, although the Bureau of Indexes and Archives changed names several times, there were few changes to its duties in handling the Department's correspondence.  In 1939, the Office of the Chief Clerk was abolished.  The Chief Clerk's oversight functions were assumed by an Assistant Secretary of State who managed the Department's administrative matters, and headed what eventually became the Bureau of Administration.  In 1985, the division responsible for processing diplomatic and domestic correspondence was named the Diplomatic Pouch and Mail Division.  In 1989, the Diplomatic Pouch and Mail division was transferred to the Bureau of Diplomatic Security and gained the acronym DPM.  In 1993, the DPM was transferred back to the Bureau of Administration, where it remains to this day.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Dated: __28 FEB 2008__

_Mark Hove_

Mark Hove
Historian
Office of the Historian/Public Affairs
Department of State
2401 E Street
Washington, DC 20522-0104

ATTACHMENT 3


**DIVISION OF STATE DEPARTMENT ARCHIVES**
**OUTLINE OF THE FUNCTIONS**
**OF THE OFFICES OF THE DEPARTMENT OF STATE**

HISTORICAL OFFICE
DEPARTMENT OF STATE
REFERENCE COPY

# OUTLINE OF THE FUNCTIONS OF THE OFFICES

## OF THE

## DEPARTMENT OF STATE

## 1789-1943

Prepared
in the
Division of State Department Archives
National Archives
by
Natalia Summers

1943

Chief Clerk                                                                                    1818
is at the rate of $2,000 a year (Daniel Brent). *House Document 194. 15th Congress, 1st Session*, Volume 7, serial 11

June 30, 1833

The duties of the office will be such in all respects as appertain to the Under Secretary of State. He will exercise an immediate superintendence over the duties of the respective bureaus, and over those employed in them. He will see that the letters and other communications are regularly registered and distributed, receive the directions of the Secretary, and promptly report all acts of omission, or of negligence and misconduct, to the Secretary. Order of Secretary McLane, June 30, 1833.

October 31, 1834

The same as before to "and over those employed in them", then follows: "He will receive the directions of the Secretary on matters requiring the action of the Department. He will promptly report all acts of negligence or misconduct, to the Secretary." By the Act of July 27, 1789 the Chief Clerk is to be employed in the Department as the Secretary shall deem proper and is to have charge and custody of all records, books and papers appertaining to the Department, whenever the Secretary shall be removed from office, or in any other case of vacancy. Order of Secretary Forsyth, October 31, 1834.

1842

Shall supervise, under the direction of his immediate superior, the duties of the other clerks therein, and see that they are faithfully performed. (Act of August 26, 1842)

1842

To make draughts of letters which are to be prepared on official business for the consideration of the Secretary; to write letters on matters of minor importance; and to revise those written, under direction of the Secretary, in the various bureaus, before presenting them for signature.
To assist the Secretary in inspecting the letters which are daily received, and in distributing them among the different bureaus.
To see to the execution of many miscellaneous duties not particularly referable to any bureau; such as answers to calls of Congress, authenticating copies of the laws of Congress for publication, &c.
The general receiving of orders from the Secretary; seeing to their execution; directing the allotment of extra business among the various clerks; and superintending the daily business of the Department.

Chief Clerk                                                                                    1842
In the absence of the Secretary, the chief clerk has charge of the files, records, &c., of the Department, and, usually, of the duties of that officer , under a letter of appointment from the President.
In the regulations adopted by the Secretary of State, in 1836, the duties assigned to the chief clerk were as follows:
"The duties of this officer will be such, in all respects, as appertain to under Secretary of State. He will exercise an immediate superintendence over the duties of the respective bureaus, and over those employed in them; he will receive the directions of the Secretary on matters requiring the action of the Department; he will promptly report all acts of negligence or misconduct to the Secretary. By the act of the 27th of July, 1789, the chief clerk is to be employed in the Department as the Secretary shall deem proper, and is to have the charge and custody of all records, books, and papers, appertaining to the Department, whenever the Secretary shall be removed from office, or in any other case of vacancy." *House Document 177, 27th Congress, 2d Session*, serial 404.

Chief Clerk                                                                                    1846
Is the Assistant of the Secretary in regard to the business of the Department generally, and, when he is absent at cabinet meetings, or engaged in conferences, at the department, represents him by receiving persons having business with it. He receives the mails, opens and peruses despatches and other communications as they come in, and refers them to the appropriate clerks; revises drafts of papers prepared by them, and of all papers prepared for the Secretary's signature; drafts letters, or gives directions in regard thereto, and generally in regard to all points arising in the course of the business of the department, and to all matters requiring its action, so far as the nature of the subject admits of this being done without bringing in the first instance before the Secretary, to whose consideration every matter must be brought before it can be disposed of - he being the only person

- 45 -

Chief Clerk    1846

authorized to act upon any subject, or to determine upon any matter calling for determination. *House Report No. 552, 29th Congress, 1st Session*[1]

1870

Custody of the archives and rolls; receipt and distribution of the correspondence; indexing of records.

1872

General supervision of the clerks and employees of the Department; custody of archives; receipt and distribution of the correspondence; indexing the records.

1873

General supervision of the clerks and employees of the Department. (Other duties transferred to the Bureau of Indexes and Archives and to the Keeper of Rolls.)

1879

This officer has general supervision of the clerks of the department, and directs the distribution, method, and dispatch of business. His duties pertain to numerous details which cannot be well particularized here. It is sufficient to say that they are of the same general character as those devolving upon other chief clerks as provided by law. *Executive Department of the United States Government*, Webster Elmes, 1879.

Chief Clerk    1887

He has the general supervision of the clerks and employees and of the business of the Department.

...the daily mail...is placed upon the Chief Clerk's desk, read by the Chief Clerk and distributed among the Assistant Secretaries for their action. During the day the Chief Clerk receives and transacts the business of all persons having interests connected with the Department of State, other than those whose business is of such a character as to require the personal hearing of the Secretary of State or the Assistant Secretaries. It not unfrequently happens that the Chief Clerk is able to save the Secretary of State from much needless interruption by ascertaining and disposing of the business of visitors who would otherwise think it necessary to see the Secretary. Business of this character involves inquiries relative to matters connected with later International Claims Commissions, whose records are deposited in the Department of State; inquiries in regard to passports, extradition of criminals, publications of this and other Departments; inquiries in regard to applications for free entries by foreign ministers; inquiries on all subjects from members of the press; inquiries bearing on historical questions contained in the Revolutionary archives of the Department, and, in brief, all questions naturally connecting themselves with the Department of State of the United States. Report of the Chief Clerk, April 26, 1887. *Senate Report No. 507, Part 3, 50th Congress, 1st Session.*

1898

The Chief Clerk of the Department of State is its executive officer under the direction of the Secretary of State. He has the general supervision of the clerks and employees and of the business of the Department...After the daily mail is received at the Department, opened and indexed...it is placed upon the Chief Clerk's desk, read by the Chief Clerk, and distributed among the Assistant Secretaries for their action. During the day the Chief Clerk receives and transacts the business of all persons having interests connected with the Department of State, other than those whose business is of such a character as to require the personal hearing of the Secretary of State or the Assistant Secretaries...Business of this character involves inquiries relative to matters connected with the late International Claims Commissions, whose records are deposited in the Department of State; inquiries in regard to passports, extradition of criminals, publications of this and other Departments; inquiries in regard to the applications for free entries by foreign ministers; inquiries on all subjects from members of the press; inquiries bearing on historical questions contained in the Revolutionary archives of the Department, and, in brief all questions naturally connecting themselves with the Department of State of the United States.

In the afternoon the mail prepared for the signature of the Secretary and Assistant Secretaries, and embodied in their instructions, is delivered to the Chief Clerk, who reads it carefully and forwards it to the Secretary and Assistant Secretaries for their respective

---

[1]See also, the Bureau of Indexes and Archives for the description of duties of the clerk of Rolls and Archives in 1846, for the part relating to the care of rolls and archives.

Civ. No. 1:07-cv-01805 PLF

SUPPLY UNIT
AND
DIPLOMATIC POUCH AND MAIL SECTION

**Packing**                                                                                        1837
One clerk employed in packing, arranging, and preserving newspapers and printed documents.

**Messengers, Laborers, Agents, etc.**                                                             1842
One person, at $800 per annum, employed in packing, in filing, arranging, and preserving printed documents, newspapers, etc.; assisting in the compilation and distribution of the laws and documents of Congress; preparing Mediterranean passports and sea letters; putting up mails for Europe; and keeping an index of all bills and documents printed by Congress, and filing them. *House Document 177, 27th Congress, 2d Session, serial 404.*

**Packer**                                                                                         1849

**Superintendent of packing room—proof reader**                                                    1855

**Abolished**                                                                                       1857

**Stationary room**                                                                                 1917

**Supply Section**                                                                                  1932

**Supply Unit**                                                                                      1938

**Mail Clerk**                                                                                       1871

**Mails**                                                                                            1872
Superintendent of foreign mails.

**Mail Clerk**                                                                                       1893

                                                                                                    1917
Duties included in those of the Office of the Chief Clerk, as Diplomatic Pouch and Mail Section.

**Mail Clerk**                                                                                       1871
The pouches containing the mail shall be opened immediately upon their arrival in the Department, and the official mail delivered without delay to the index clerks for entry and distribution. Rules and Regulations of the Department of State, January 3, 1871. Extract. *Register of the Department of State, 1871.*

**Mails**                                                                                            1872
Superintendent of foreign mails.

**Mail Clerk**                                                                                       1893

**Mailing Section**                                                                                  1911
All incoming and outgoing diplomatic pouch mail, as well as the domestic and other mail matter, is handled by this section. The packing and forwarding of all diplomatic mail pouches, as well as the opening and checking up of contents of all incoming pouches, is performed here. *Outline of the Organization and Work of the Department of State, 1911. Extract.*

                                                                                                    1917
Duties included in those of the Office of the Chief Clerk, as Diplomatic Pouch and Mail Section.[1]

---

[1] *No Departmental Order placing the Mail Clerk under the office of the Chief Clerk was found. It is indicated, however, in the Department's Register, 1917, page 24.*

- 51 -

ATTACHMENT 4


**REGISTER OF THE DEPARTMENT OF STATE**
**REGULATIONS OF THE DEPARTMENT OF STATE**
**1871**

# REGISTER

OF

# THE DEPARTMENT OF STATE,

CONTAINING

A LIST OF PERSONS EMPLOYED IN THE DEPARTMENT AND IN THE DIPLOMATIC,
CONSULAR, AND TERRITORIAL SERVICE OF THE UNITED STATES,
WITH MAPS SHOWING WHERE THE MINISTERS
AND CONSULS ARE RESIDENT
ABROAD.

ALSO

A LIST OF THE DIPLOMATIC OFFICERS AND CONSULS OF
FOREIGN COUNTRIES RESIDENT WITHIN
THE UNITED STATES.

Corrected to July 1, 1871.



WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1871.

moneys in his possession—1. Statement of trust and other funds (not appropriations) in the custody of the clerk. 2. Date when received. 3. Origin of fund. 4. Original amount. 5. Amount of interest, and when received. 6. Present amount of fund. 7. Nature of investments, and where deposited. 8. Amount in the hands of disbursing clerk. 9. Where amount in the hands of clerk is deposited. In all cases the total of balances in hand to be footed up.

V. Reports and abstracts prepared for the use of the Secretary, or either of the Assistant Secretaries, should be made on blanks prepared for the purpose, and should concisely and fully present the facts, issues, and points of argument, and generally all information necessary to the complete understanding of the subject, with all necessary references. The labor of reviewing the correspondence should not devolve upon either of the Secretaries, but must be performed by the clerk who may be directed to make the report or abstract.

VI. The pouches containing the mail shall be opened immediately upon their arrival in the Department, and the official mail delivered without delay to the index clerk for entry and distribution. All papers sent out by the Secretary, or either of the Assistant Secretaries, will be at once taken to the index room for indexing or distribution. All correspondence requiring the signature of the Secretary, or the Assistant Secretaries, must be prepared and delivered to the Chief Clerk by 2½ o'clock, and by him delivered for signature at 3 o'clock.

VII. All dispatches and correspondence, both to and from the Department, not of a personal character, will pass to the Secretary's table through the room of the proper Assistant Secretary. In returning letters and instructions sent to the Secretary for signature, an opportunity will be given to each Assistant Secretary to see the correspondence which has not been submitted to his inspection.

VIII. The index room shall be the depository for the archives, the dispatches, notes, and letters to the Department, except those relating to passports, and to applications for office, and for the records of the official and other correspondence from the Department. Dispatches and letters received must be acknowledged at the earliest practicable moment after their receipt in the various Bureaus and returned to the index room to await final reply, if further answer is necessary.

IX. Detention of papers, either on desks or shelves of any of the various Bureaus, excepting draughts of instructions, is prohibited, without special approval of the Assistant Secretary who has charge of the Bureau. All communications should bear indorsement of the dates of the action of the Department. On all copies of papers addressed to the Department should be noted the date of their receipt.

X. Clerks finding it necessary to withdraw papers or records from the index room, shall leave in the place thereof a signed memorandum, describing the book or paper. When the course of business may require the reference of a paper from one Bureau to another, a memorandum, showing the date of such reference, should be made and deposited in the index room by the clerk making the reference.

XI. It is desirable to keep the index room free during office hours, so far as possible; therefore clerks wishing papers will send for the same through messengers, when practicable; and all requisitions from the Secretary or Assistant Secretaries, for papers, will be referred to the index clerks.

XII. All instructions, notes, or letters from the Department, containing inclosures, will be accompanied by a "list of inclosures," showing from whom received, and to whom addressed, (or their general subjects, if not particularly addressed,) and the date. This list will in all cases be recorded with the dispatch, with a marginal reference to the book or file in the Department where the inclosure can be found. Each inclosure must be noted in the same manner. The clerks will also insert in the record books such marginal references as to the inclosures in the correspondence since March, 1869.

HAMILTON FISH, *Secretary.*

**ATTACHMENT 5**

**U.S. DEPARTMENT OF STATE FOREIGN AFFAIRS HANDBOOK
EXCERPTS**

# 14 FAH-4 H-500 DIPLOMATIC POUCH

## 14 FAH-4 H-510 GENERAL DIPLOMATIC POUCH PROCEDURES

*(CT:DPM-1;   06-28-2007)*
*(Office of origin:  A/LM/PMP/DPM)*

## 14 FAH-4 H-511  USE

*(CT:DPM-1;   06-28-2007)*

a. The diplomatic pouch transports items for official use of the Mission across international frontiers without procedural delay and without inspection by foreign government officials.

b. Each envelope, package or other outer cover (including collective cover) of official material originated by any Federal agency for transport by diplomatic pouch must be marked (top, bottom, front, and back) with the highest security classification or administrative control designation of material it contains.  It also must include a Diplomatic Pouch Mail Registration, Form OF-120.  The Defense Courier Service and U.S. Navy registered mail do not require Form OF-120.

c. Most diplomatic pouches are dispatched unaccompanied.  The pouch itself must not provide clues to the nature of its contents by displaying notice labels or organizational symbols.

d. Pouches that contain classified items are prepared and documented in the same manner as pouches containing unclassified items.  The only difference is that they are dispatched accompanied by a Diplomatic Courier or another authorized U.S. Government employee.  Whether the pouch is dispatched accompanied or unaccompanied, its only purpose is to protect diplomatic and national security information.  It is not intended to protect items of great monetary value or to function as an express mail service.

letter mail to category B posts if a direct pouch service is available.  If direct service is not available, they must affix appropriate U.S. postage for mailing.

c. Category A posts may accept mail received by APO/FPO or USPS for forwarding by pouch to other posts only if approved by the Department.  Upon approval, items received via the APO/FPO for forwarding to post by pouch must meet diplomatic pouch criteria for length, width, girth and weight not the APO/FPO criteria.  This is necessary to be sure the items will fit into a diplomatic pouch.

# 14 FAH-4 H-518.2  Category B Posts

*(CT:DPM-1;  06-28-2007)*

a. Category B posts do not have access to APO/FPO facilities or to the USPS.  These posts have full access to the diplomatic pouch system for all mail.

b. Category B posts may send letter mail to other category B posts by pouch.  Letters from category B posts to category A posts may be sent by pouch if direct pouch service is available.  If direct pouch service is not available, forward the letters to the Department with appropriate US postage for mailing.

c. Category B posts may use the (A) pouch to receive flats and merchandise parcels from the Department.  Parcels may not exceed 17 inches X 18 inches X 30 inches in any dimension.  Parcels must not weigh more than 45 pounds.  Employees must ensure that all correspondents are aware of the size and weight limitations.

d. Employee Associations at Category B posts that are also 15 percent or greater hardship differential posts, may use the (A) pouch to receive not more than ten videocassettes or DVDs per month from the Department for video club rental and not for resale.  Previous language on size and weight for personal packages is hereby deleted.  Previous language absolutely prohibiting use by Employee Associations is hereby modified to this extent.

# 14 FAH-4 H-518.3  Category C Posts

*(CT:DPM-1;  06-28-2007)*

Category C posts receive all mail by international mail.

U.S. Department of State Foreign Affairs Handbook Volume 14 Handbook 4 -
Diplomatic Pouch and Mail Handbook

# 14 FAH-4 EXHIBIT H-518A
# POST MAIL CATEGORIES

*(CT:DPM-1;   06-28-2007)*

| | | | | | | |
|---|---|---|---|---|---|---|
| Abidjan | B | Bogota | A | Dublin | B |
| Abu Dhabi | B | Bordeauz | A | Durban | B |
| Abuja | B | Brasilia | A | Dushanbe | B |
| Accra | B | Bratislava | B | Dusseldorf | A |
| Adana | A | Brazzaville | B | Edinburg | A |
| Addis Ababa | B | Bridgetown | A | Florence | A |
| Algiers | B | Brussels | A | Frankfurt | A |
| Almaty | B | Bucharest | B | Freetown | B |
| Amman | A | Budapest | B | Fukuoka | A |
| Amsterdam | A | Buenos Aires | A | Gaborone | B |
| Ankara | A | Bujumbura | B | Geneva | A |
| Antananarivo | B | Cairo | A | Georgetown | B |
| Antwerp (ELSO) | A | Calgary | C | Grenada | (2) |
| Apia | B | Calcutta | B | Guadalajara | D |
| Ashgabat | B | Canberra | A | Guangzhou | A |
| Asmara | B | Capetown | B | Guatemala | A |
| Asuncion | A | Caracas | A | Guayaquil | A |
| Athens | A | Casablanca | A | Hague, The | A |
| Auckland | A | Chengdu | A | Halifax | C |
| Baghdad | B | Chennai | B | Hamburg | B |
| Baku | B | Chiang Mai | A | Hamilton | B |
| Bamako | B | Chisinau | B | Hanoi | A |
| Bandar Seri | | Ciudad Juarez | D | Harare | B |
|    Begawan | A | Colombo | B | Havana | B |
| Bangkok | A | Conakry | B | Helsinki | A |
| Bangui | (3) | Copenhagen | A | Hermosillo | D |
| Banjul | B | Cotonou | B | Hochi Minh City | A |
| Barcelona | A | Curacao | C | Hong Kong | A |
| Beijing | A | Dakar | B | Islamabad | A |
| Beirut | A | Damascus | B | Istanbul | A |
| Belfast | A | Dar es Salaam | B | Izmir | A |
| Belgrade | B | Dhahran | A | Jakarta | A |
| Belize City | A | Dhaka | B | Jeddah | A |
| Berlin | A | Dili | A | Jersualem | A |
| Bern | B | Djibouti | B | Johannesburg | B |
| Bishkek | A | Doha | B | Kabul | A |
| Bissau | (3) | Dubai | B | Kampala | B |

U.S. Department of State Foreign Affairs Handbook Volume 14 Handbook 4 -
Diplomatic Pouch and Mail Handbook

| | | | | | | |
|---|---|---|---|---|---|
| Karachi | A | Montreal | D | Riga | A |
| Kathmandu | B | Moscow | A | Rio de Janeiro | A |
| Khartoum | B | Mumbai | B | Riyadh | A |
| Kiev | B | Munich | A | Rome | A |
| Kigali | B | Muscat | B | San Jose | A |
| Kingston | B | N'Djamena | B | San Salvador | A |
| Kinshasa | A | Nagoya | A | Sanaa | B |
| Kolonia | C | Naha | A | Santiago | A |
| Koror | C | Nairobi | A | Santo Domingo | A |
| Krakow | B | Naples | A | Sao Paulo | A |
| Kuala Lumpur | A | Nassau | B | Sapporo | A |
| Kuwait | A | New Delhi | B | Sarajevo | B |
| La Paz | A | | | Seoul | A |
| Lagos | B | Niamey | B | Shanghai | A |
| Lahore | A | Nicosia | A | Shenyang | A |
| Leipzig | A | Nogales | D | Singapore | A |
| Libreville | B | Nouakchott | B | Skopje | B |
| Lille | A | Nuevo Laredo | D | Sofia | B |
| Lilongwe | B | Osaka-Kobe | A | St. George's | B |
| Lima | A | Oslo | A | St. Petersburg | A |
| Lisbon | A | Ottawa | D | Stockholm | B |
| Ljubljana | B | Ouagadougou | B | Strasbourg | A |
| Lome | B | Panama City | A | Surabaya | A |
| London | A | Paramaribo | B | Suva | B |
| Luanda | B | Paris | A | Sydney | A |
| Lusaka | B | Perth | A | Taipei | B |
| Luxembourg | A | Peshawar | A | Tallinn | A |
| Madrid | A | Phnom Penh | A | Tashkent | A |
| Majuro | C | Podgorica | B | Tbilisi | B |
| Managua | A | Ponta Delgada | A | Tegucigalpa | A |
| Manama | A | Port au Prince | B | Tel Aviv | A |
| Manila | A | Port Louis | B | Thessaloniki | A |
| Maputo | B | Port Moresby | B | Tijuana | D |
| Marseille | A | Port of Spain | B | Tirana | B |
| Maseru | B | Poznan | B | Tokyo | A |
| Matamoros | D | Prague | B | Toronto | D |
| Mbabane | B | Praia | B | Tunis | B |
| Melbourne | A | Pretoria | B | Ulaanbaatar | A |
| Merida | D | Pristina | B | Valletta | B |
| Mexico City | D | Quebec | D | Vancouver | D |
| Milan | A | Quito | A | Vatican City | A |
| Minsk | B | Rabat | A | Vienna | A |
| Monrovia | B | Rangoon | A | Vientiane | B |
| Monterrey | D | Recife | A | Vilnius | A |
| Montevideo | A | Reykjavik | A | Vladivostok | B |

U.S. Department of State Foreign Affairs Handbook Volume 14 Handbook 4 -
Diplomatic Pouch and Mail Handbook

| | | | | | |
|---|---|---|---|---|---|
| Warsaw | B | Yaounde | B | Zagreb | B |
| Wellington | A | Yekaterinburg | B | Zurich | B |
| Windhoek | B | Yerevan | B | | |

A—Post has access to an APO or
   FPO.
B—Post receives all mail by
   diplomatic pouch.
C—Post receives all mail by
   international mail.
D—Post receives mail at a border
   city PO Box.
1—Post Closed.  No service.
2—See St. George's.
3—Service temporarily suspended.

**ATTACHMENT  6**

**U. S. DEPARTMENT OF STATE FOREIGN AFFAIRS MANUAL
EXCERPTS**

# 1 FAM 000
# AUTHORITY, RESPONSIBILITY, AND ORGANIZATION

# 1 FAM 010
# AUTHORITY, RESPONSIBILITY, AND ORGANIZATION

*(CT:ORG-170;   08-23-2007)*
*(Office of Origin:  A/ISS/DIR)*

## 1 FAM 011  AUTHORITY FOR CONDUCTING FOREIGN RELATIONS

*(TL:ORG-62;   01-31-1995)*

The Constitution vests in the President the power to make treaties and appoint ambassadors, other public ministers, and consuls, by and with the advice and consent of the Senate.  By derivation from these Constitutional provisions, the President exercises primary authority and responsibility for the formulation and execution of foreign policy.

## 1 FAM 011.1  Scope

*(TL:ORG-104;   06-30-2001)*

a. The functional statements or organizational responsibilities and authorities assigned to each major component of the Department are described in this volume of the Foreign Affairs Manual.  They comprise the basic organizational directive of the Department of State.

b. This volume also cites the more important legislation and executive orders, accompanied by charts, where appropriate, relating to the responsibilities of the Department of State.

c. The official organization chart of the Department, 1 FAM Exhibit 011.1, derives from the functional statements contained in this volume.

U.S. Department of State Foreign Affairs Manual Volume 1—Organization and Functions

    (3)    Effective employee utilization.

b. The first step is to identify the basic mission and authorities delegated to the organization.  Organizational planning should then be guided by the objective categories outlined below:

    (1)    Meeting Department priorities;

    (2)    Improving service delivery; and

    (3)    Improving internal management.

# 1 FAM 014.2  Organizational Nomenclature

*(TL:ORG-62;   01-31-1995)*

The basic nomenclature for the Department's organizational structure is summarized in this section.  There are some exceptions to the basic nomenclature; these exceptions, for the most part, reflect specific legislative requirements.

| Organization Level | Title of Nomenclature | Organization Head |
|---|---|---|
| Level 1 | Department | Secretary |
| Level 1a | Department | Deputy Secretary |
| Level 1b | Department | Under Secretary |
| Level 1c | Department | Ambassador at Large |
| Level 2 | Bureau | Assistant Secretary |
| Level 3 | Nonspecified | Deputy Asst. Sec. |
| Level 3a | Directorate | Managing Director |
| Level 4 | Office | Director |
| Level 5 | Division | Chief |
| Level 6 | Branch | Chief |
| Level 7 | Section | Chief |

# 1 FAM 014.3  Generic Responsibilities

*(TL:ORG-62;   01-31-1995)*

a. The Department is headed by the Secretary who promulgates such rules and regulations as may be necessary to carry out the functions vested by statute or executive order in the Department.  The Secretary may delegate authority to perform any of these functions including, if so specified, the authority to redelegate any of the functions to officers and employees under the Secretary's direction and supervision (22 U.S.C. 2651a):

U.S. Department of State Foreign Affairs Manual Volume 1—Organization and Functions

    (1)    The Deputy Secretary serves as the Acting Secretary in the Secretary's absence.  The Deputy Secretary also serves as principal adviser to the Secretary in the formulation and conduct of all U.S. foreign policy and assists the Secretary in providing overall supervision and direction to all substantive and administrative elements of the Department;

    (2)    Under Secretaries assist the Secretary and Deputy Secretary in the formulation and conduct of U.S. foreign policy and provide specific leadership in matters such as:

        (a)    Interdepartmental activities of the U.S. Government abroad;

        (b)    Intergovernmental affairs;

        (c)    Foreign economic and commercial policy;

        (d)    Security assistance programs;

        (e)    Global human rights, crime, science, and environment programs; and

        (f)    Administrative operations of the Department;

    (3)    Ambassadors at Large are appointed by the President and serve anywhere in the world to help with emergent problems, to conduct special or intensive negotiations, or serve in other capacities, as requested by the Secretary or the President.

b.  Bureaus and some other specified Department organizations, usually headed by Assistant Secretaries or positions administratively equivalent to the rank of Assistant Secretary, administer one or more major functions of the Department.  If the bureau has more than one major function and is an organization of substantial size and or complexity, it should be further structured to have deputy assistant secretaries (DAS), or positions ranked equivalent thereto, to oversee these major functions. Where the size and scope of a major function requires it, a managing director may oversee collections of office-level sub-functions.  A managing director is never equivalent to deputy assistant secretary rank. Managing directors only report directly to deputy assistant secretaries, and directorate structure is such that managing directors are to have clearly defined managerial responsibilities (they are not deputies to deputy assistant secretaries).

c.  Offices are structures below the DASs and are constructed around subfunctions which require application of discrete bodies of knowledge and the exercise of policy control within that field.  These structures

(September 20, 1994) (report on Middle East arms sales policy, prohibition on incentive payments under the Arms Export control Act, notification to Congress on certain events involving the missile technology control scheme, advisory opinions regarding sanctions for nuclear proliferation);

(8)    Public Notice 802, dated March 30, 1982 (47 FR 16131) as amended by Public Notice 903, dated May 4, 1984 (49 FR 20590);

(9)    Executive Order 11958 (arms control);

(10)    Executive Order 12163 section 1-201 (military assistance); and

(11)    Other authorities, as appropriate.

# 1 FAM 044  UNDER SECRETARY FOR MANAGEMENT (M)

## 1 FAM 044.1  Responsibilities

*(TL:ORG-120;   01-02-2003)*
*(Effective 1-15-97)*

The Under Secretary for Management (M):

(1)    Reports directly to the Secretary of State (S);

(2)    Serves as a principal adviser to the Secretary of State on all matters involving the allocation of State Department resources in support of the President's foreign policy objectives;

(3)    Develops and executes management policies, including control of positions, funds, and other worldwide Department resources required to implement the foreign policies of the United States;

(4)    Directs Department management programs involving relations with the Congress, the Office of Management and Budget (OMB), and other foreign affairs agencies;

(5)    Is responsible for the organization, operations, and the assignment of functions within the Department;

(6)    Prescribes rules and regulations pursuant to the authority vested in the Secretary by 22 U.S.C. 2651a, 22 U.S.C. 3926 and other relevant provisions of law, to the extent delegated to him or her and approves, when appropriate, redelegations of such authority in order to carry out the functions conferred upon the Under Secretary for Management;

(7)    Oversees the Department's information security program;

U.S. Department of State Foreign Affairs Manual Volume 1—Organization and Functions

(8)   Negotiates, signs, and terminates treaties and other international agreements and authorizes other U.S. Government officials to do so under the Circular 175 procedure of the Department;

(9)   Assists the Secretary, on request, in representing the United States at international meetings, in performing other representational assignments, and in presenting the Department's position before congressional committees;

(10)  As the Department's designated audit follow-up official, has personal responsibility for ensuring that:

(a)   Systems for audit follow-up, resolution, and corrective action are documented and in place;

(b)   Timely responses are made to all audit recommendations, regardless of implementation responsibilities;

(c)   Disagreements are resolved;

(d)   Corrective actions are actually taken; and

(e)   Semiannual reports are sent to the Secretary furnishing a listing of all audit recommendations not resolved for more than 6 months, the reasons why they have not been resolved, and M's plan for ensuring resolution; the number of recommendations resolved during the reporting period; the amount of disallowed costs; and collections, offsets, write-offs, demands for payment, other monetary benefits resulting from audits, and updates on the status of those recommendations reported unresolved for the previous reporting period;

(11)  Exercises authority on behalf of the Secretary of State over management-related functions vested in the Department of State and the Management of the Foreign Service personnel system;

(12)  In the absence of the Secretary, Deputy Secretary, and Under Secretary for Political Affairs, serves as Acting Secretary of State as provided in E.O. 13251 of December 28, 2001;

(13)  Directs and administers the Department's worldwide information resources; and

(14)  Has substantive and coordinating responsibility for 1 FAM 044— Under Secretary for Management (M).

# 1 FAM 044.2  Organization

*(CT:ORG-151;   03-14-2006)*

An organization chart of M is found as 1 FAM Exhibit 044.2.

U.S. Department of State Foreign Affairs Manual Volume 1—Organization and Functions

# 1 FAM 044.3  Management Oversight
*(CT:ORG-152;  03-14-2006)*

a. The following Department of State bureaus report directly to the Under Secretary (M):

  (1)    Bureau of Administration (A);

  (2)    Bureau of Consular Affairs (CA);

  (3)    Bureau of Diplomatic Security (DS);

  (4)    Bureau of Information Resource Management (IRM); however, the head of IRM, when carrying out the functions of the CIO as established by the Clinger-Cohen Act, reports directly to the Secretary;

  (6)    Medical Services and DASHO;

  (5)    Bureau of Human Resources (HR);

  (6)    Foreign Service Institute (FSI); and

  (7)    Bureau of Overseas Buildings Operations (OBO).

b. The Bureau of Resource Management (RM) coordinates with M and reports to D.

## 1 FAM 044.3-1  Director of the Diplomatic Reception Rooms (M/FA)
*(TL:ORG-126;  08-13-2003)*

The Director of the Diplomatic Reception Rooms (M/FA) is responsible for furnishing and maintaining the Diplomatic Reception Rooms and offices and reception rooms of the Secretary, Deputy Secretary, and Under Secretary for Political Affairs.  The Director is responsible for assembling and maintaining the Americana Project's collection of U.S. antique furniture, paintings, and decorative objects from the 18th and early 19th centuries, made possible by contributed funds.

## 1 FAM 044.3-2  White House Liaison (M/WHL)
*(TL:ORG-126;  08-13-2003)*

The White House Liaison (M/WHL):

  (1)    Advises, assists, and facilitates all non-career appointments within the Department, including Presidential Appointees requiring Senate confirmation (PAS), Senior Executive Service (SES), and Schedule C.  He or she formulates, communicates, and coordinates between

U.S. Department of State Foreign Affairs Manual Volume 1—
Organization and Functions

a. The Logistics Systems Division (A/LM/PMP/SYS) designs and develops logistics information systems consistent with appropriate strategic and tactical plans to include the Integrated Logistics Management System (ILMS).

b. A/LM/PMP/SYS provides agency-wide logistics system support related to acquisition/procurement, transportation, warehouse management, property management, and diplomatic pouch and mail and provides subject matter expertise for systems applications.

c. A/LM/PMP/SYS develops, implements, installs, and maintains web-based applications, tools, and web sites.  A/LM/PMP/SYS works with the operational units to develop content for the organization's web sites.

d. A/LM/PMP/SYS provides technical expertise in analyzing, diagnosing, and resolving problems in support of web platforms and applications and logistics management systems.

e. A/LM/PMP/SYS supports the Department's IRM Strategic Plan, IRM Tactical Plan, and IRM Architectural Framework.

f. A/LM/PMP/SYS provides information technology project management support.

# 1 FAM 215.4-4  Diplomatic Pouch and Mail Division (A/LM/PMP/DPM)

*(CT:ORG-154;  04-10-2006)*

a. The Diplomatic Pouch and Mail Division (A/LM/PMP/DPM) provides unclassified pouch and mail services to the Department.

b. A/LM/PMP/DPM administers the domestic classified pouch and mail operations for the Department of State and prepares classified pouches for delivery abroad.  (See 12 FAM 100 for DS/C/DC responsibilities for administering the worldwide program for delivery of classified pouches via diplomatic couriers.)

c. A/LM/PMP/DPM is responsible for the worldwide scheduling, dispatch, transportation, auditing, and tracing of unaccompanied diplomatic pouches.

d. A/LM/PMP/DPM provides liaison with commercial carriers and coordinates tariffs and routing proposals for unclassified pouches.  A/LM/PMP/DPM selects originating carriers for unclassified pouch dispatches and provides advice to posts on routing unclassified pouches to the Department.

e. A/LM/PMP/DPM surveys the flow of mail in the system and serves as liaison to the U.S. Postal Service and Military Postal Service Agency.

U.S. Department of State Foreign Affairs Manual Volume 1—
Organization and Functions

f.  A/LM/PMP/DPM provides information and policy guidance to the foreign affairs community on effective use of both the classified and unclassified pouch and mail systems.

g.  A/LM/PMP/DPM acts as the contracting officer's representative for the Department's internal messenger system contract and the Department's mail labor contract.

h.  A/LM/PMP/DPM dispatches and receives all classified and unclassified diplomatic pouches for the Department of State.

i.  A/LM/PMP/DPM manages the Department's mail processing system, which segregates mail by type (i.e., flat, parcel, or envelope, registered or unregistered), and sorts and delivers it to its final destination.

j.  A/LM/PMP/DPM serves as the Department's liaison to other Federal agencies and Foreign Service posts regarding the preparation and accountability of the materials that are entered into the classified pouch system prior to dispatch to the Diplomatic Courier Service for delivery. A/LM/PMP/DPM maintains liaison with the Diplomatic and Defense Courier services to ensure that the classified pouch dispatch coincides with scheduled courier services for delivery to Foreign Service posts worldwide.

k.  A/LM/PMP/DPM develops and coordinates plans within the Department and other U.S. Government agencies that address the requirements for routing classified mail to Department posts and offices worldwide.

# 1 FAM 216  THROUGH 219 UNASSIGNED

## 1 FAM 216.2-3   Logistics Systems Division (A/LM/PMP/SYS)

*(TL:ORG-72;  11-25-1998)*

In coordination with A/EX, designs and develops logistics information systems consistent with appropriate strategic and tactical plans. Information technology will provide integrated logistics support to bureaus, offices, embassies, other posts, and serviced agencies in such functional areas as procurement, transportation, claims, warehousing, inventory and property management, and mail and pouch. Responsibilities include information systems strategy and acquisition strategy, requirements analysis, systems design, development, and integration. This is accomplished within policy guidance promulgated by the Chief Information Officer, in accordance with the Department's IRM Strategic Plan, IRM Tactical Plan, and IRM Architectural Framework.

## 1 FAM 216.2-4  Diplomatic Pouch and Mail Division (A/LM/PMP/DPM)

*(TL:ORG-72;  11-25-1998)*

a.     Responsible for the Department's unclassified pouch and mail services.

b.     Administers the domestic classified pouch and mail operations for the Department of State and prepares classified pouches for delivery abroad. (See 12 FAM 100 for DS/CIS/DC responsibilities for administering the worldwide program for deliver of classified pouches via diplomatic couriers.)

c.     Responsible for the worldwide scheduling, dispatch, transportation, auditing, and tracing of unaccompanied diplomatic pouches.

d.     Provides liaison with commercial carriers and coordinates tariffs and routing proposals for unclassified pouches. Selects originating carriers for unclassified pouch dispatches and provides advice to posts on routing unclassified pouches to the Department.

e.     Surveys the flow of mail in the system and serves as a liaison to the U.S. Postal Service and Military Postal Service Agency.

f.     Provides information and policy guidance to the foreign affairs community on effective use of both the classified and unclassified pouch and mail systems.

g.     Acts as the contractor officer representative for the Department's internal messenger system contract and the Department's mail labor contract.

for Administration and is composed of designated representatives from other Department bureaus.  It meets as necessary to provide guidance and direction on FAM issues and to resolve clearance issues between offices concerning FAM material.

# 2 FAM 1114  DEFINITIONS

*(CT:GEN-337;   06-12-2007)*
*(State Only)*

**Change Transmittal (CT) (formerly known as Transmittal Letter (TL)**:  The official document that implements formal directive changes to the FAM or FAH.  It provides effective dates and necessary instructions for incorporating changes into the FAM or FAH.

**Directive**:  A written communication establishing and prescribing the organizations, policies, or procedures that provide an official basis of Department of State operation.

**Foreign Affairs Handbook (FAH)**:  An extension of the Foreign Affairs Manual.  This supplemental series provides implementing guidelines and detailed procedures for directives contained in the FAM.  The term "Handbook" denotes a Foreign Affairs Handbook.  (See also 2 FAM 1115.5-1.)

**Foreign Affairs Manual (FAM)**:  The formal written document for recording, maintaining, and issuing Department directives.  The term "manual" denotes the Foreign Affairs Manual or one of its volumes.

**Operating offices:**  These offices are responsible for carrying out the Department's mission.  They perform their functions in accordance with directives contained in the FAM.

**Program Offices**:  Department organizations that develop, implement, and manage appropriate policies and procedures regarding specified functions.  Program offices also perform oversight and periodic review of operating offices to ensure their compliance with Department directives.

**Uniform regulations**:  The term used for joint directives agreed to by the Department and other Foreign Affairs agencies and incorporated into agency directives materials (see 2 FAM 1113.5).

**Valid (validity):**  The term used to describe those directives placed in force through proper issuance as prescribed in 2 FAM 1110.

**ATTACHMENT  7**


**TIMOTHY KEITZ DECLARATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DAVID R. HOSE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 1:07-cv-01805 PLF** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **DECLARATION OF** |
| **Defendant.** | ) | **TIMOTHY KEITZ** |
| | ) | |

## DECLARATION OF TIMOTHY KEITZ

I, Timothy Keitz, do hereby declare the following:

1. My name is Timothy Keitz.

2. I currently reside in Clarksville, Maryland and am the Director of the Diplomatic Pouch and Mail Division (A/LM/PMP/DPM) for the Department of State. I have been the Director since October 2005.

3. As the Director of the Diplomatic Pouch and Mail Division, my primary responsibilities are to oversee the processing of classified, unclassified and domestic mail for the Department of State and the larger foreign affairs community.

4. Prior to that, I was the Operations Branch Chief of the Diplomatic Pouch and Mail Division for six years.

5. As the Operations Branch Chief, I had primary responsibility for the transportation management of unclassified diplomatic pouches and mail, the budget for the division, and performance management issues.

6. The Diplomatic Pouch and Mail Division is responsible for the collection, screening, sorting and distribution of U.S. mail, parcels and commercial shipments for both classified and unclassified material destined to and sent from U.S. missions abroad, including embassies and consulates. It is also responsible for the collection, screening, sorting and distribution of correspondence addressed to the Department of State Headquarters and its domestic annexes.

7. The primary facility that processes unclassified diplomatic pouch mail, parcels and domestic mail is State Annex 32 in Sterling, Virginia, a 70,000 square foot open area mail processing facility.

8. In calendar year 2001, the State Annex 32 facility processed approximately 730,000 pounds of unclassified inbound and 5,400,000 pounds of outbound pouch material. While data is not available for 2001, the State Annex 32 facility processed approximately 14,000,000 letters and flats (envelopes slightly larger than traditional letter envelopes) in 2007.

9. In 2001, the Department of State had a contract with LAM Associates, Inc. to provide mail and parcel handling labor services. Mr. Hose was one of the LAM Associates, Inc. employees who worked at the State Annex 32 facility.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/29/08

Timothy Keitz
Director Diplomatic Pouch and
    Mail Division
Department of State
2401 E Street, NW
Washington, DC 20522-0101